UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
                                       :

RAQUEL OLMO,                          :

                   Plaintiff,          :

                                  :           23-CV-10510 (JMF)

      -v-                        :

                                  :          OPINION AND ORDER

MARIELA N. MATOSLEO et al.,     :

                                :

              Defendants.     :

                                :
---------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      On September 6, 2023, Plaintiff Raquel Olmo was driving when she was stopped by New York City Police Department ("NYPD") officers at a vehicle checkpoint on the Upper West Side of Manhattan. The officers asked Olmo for her driver's license and car registration. After she refused, and the situation escalated, the officers arrested Olmo and charged her with resisting arrest, obstructing governmental administration, and disorderly conduct. Proceeding without counsel, Olmo now brings claims under federal and state law against the five NYPD officers involved in the stop and arrest. Defendants — Lieutenant Mariela N. Matosleo, Captain Noreen E. Lazarus, and Officers Edward Lam, Mateusz Kopec, and Timothy Burke — move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on all of these claims. For the reasons that follow, Defendants' motion for summary judgment is GRANTED.

## BACKGROUND

      The following relevant facts are drawn from the admissible materials submitted in connection with this motion — including, most notably, body camera footage of the vehicle stop at issue — and are either undisputed or described in the light most favorable to Olmo as the non-moving party. *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011); *cf. Scott v.*

*Harris*, 550 U.S. 372, 380-81 (2007) (considering a video of the incident at issue in reviewing a summary judgment ruling).

On September 6, 2023, Olmo was driving on Riverside Drive and West 95th Street in New York, New York, when she approached an NYPD vehicle checkpoint. *See* ECF No. 55 ("Defs.' SOMF"), at 1; ECF No. 58, Exh. O ("Pl.'s SOMF"), ¶ 2; *see also* ECF No. 65 ("Pl.'s Suppl. SOMF"), ¶ 2 ("Cones were present at the checkpoint but it was not clear what the cones were for as there was no signage of a checkpoint.").[1] NYPD Lieutenant Mariela N. Matosleo and Officers Edward Lam, Mateusz Kopec, and Timothy Burke were operating the checkpoint, the purpose of which was "to verify driver licenses, registrations, and vehicle safety." Defs.' SOMF ¶¶ 1-4. To that end, the Officers were instructed that "every third vehicle to drive into the street where the checkpoint was stationed was to be pulled over." *Id.* ¶ 5.

In accordance with that instruction, Officers Lam and Kopec "motioned" for Olmo to pull over to a set of traffic cones and verbally instructed her to do the same several times. Pl.'s SOMF ¶ 2; Pl.'s Suppl. SOMF ¶ 3; Defs.' SOMF, ¶ 6; ECF No. 52-2 ("Lam Video"), 10:11:35.[2] Officer Lam advised Olmo, who stopped short of the cones, that it was "a vehicle checkpoint"; Olmo — through her open car window — responded that she did not "consent" and stayed put. Lam Video 10:11:40-46; *see also* Pl.'s Suppl. SOMF ¶ 4. Officer Kopec, approaching the driver's side of Olmo's car, told her calmly that "we just have to see your driver license and

---

[1]    Olmo submitted what the Court construes to be a Statement of Material Facts, *see* Local Civil Rule 56.1, as an exhibit to her memorandum of law opposing Defendants' motion for summary judgment. *See* Pl.'s SOMF. Thereafter, she submitted an additional Statement of Material Facts. *See* Pl.'s Suppl. SOMF. In light of the "special solicitude" owed to Olmo as a *pro se* litigant, the Court will consider and cite to both documents. *See Tracy v. Freshwater*, 623 F.3d 90, 100-04 (2d Cir. 2010).

[2]    "[Name] Video" refers to body camera footage of the named Officer; the time stamps refer to the times embedded in the videos themselves.

registration, and you will be on your way." Lam Video 10:11:52. Olmo refused, repeatedly

stating that she did "not consent" and that she was "calling her constitutional lawyer." *Id.* at

10:12:02-13; *see* Pl.'s SOMF ¶ 4. She also repeatedly asked whether she had committed a crime.

*Id.* at 10:12:14-27; Pl.'s Suppl. SOMF ¶ 3. Officers Lam and Kopec responded that the Officers

were "conducting a vehicle checkpoint," that Olmo was "not being singled out in any particular

way," and that she had not committed a crime. Lam Video 10:12:14-30.

The stand-off continued in that vein for approximately another minute and a half (albeit

with Lieutenant Matosleo joining), at which point Officer Kopec ordered Olmo to turn off her

car. Lam Video 10:13:37. Olmo responded by once again asking Defendants to "show [her] the

law," but indicated she would put her car "in park." *Id.* at 10:13:35-40. She further stated: "I am

not following orders; I don't consent; I didn't commit a crime." *Id.* at 10:13:46-50. Officers

Lam and Kopec then ordered Olmo to step out of her car. *Id.* at 10:13:52. When Olmo refused

to do so, Officer Kopec reached into her car to unlock her door. *Id.* at 10:13:54. Olmo reacted

by attempting to roll up her window, whereupon Officer Lam grabbed Olmo's forearm while

Officer Kopec opened the door. *Id.* at 10:13:58. Officer Lam then began to take off Olmo's

seatbelt as she tried to hold on to it. *Id.* at 10:14:03. The Officers physically removed Olmo

from the car and, as she struggled and continued to protest, handcuffed her. *Id.* at 10:14:10-40,

52. Officer Kopec then walked Olmo, still in handcuffs, to a nearby NYPD vehicle; she

continued to protest the legality of her arrest and accused the Officers of "kidnapping" her. *E.g.*,

Lam Video 10:15:00 ("You didn't show me the law."); *id.* at 10:15:21 ("This is an illegal

search."); *id.* at 10:15:31-42, 10:16:03 ("This is kidnapping.").

After standing for about twenty-five or thirty seconds outside the patrol car, Olmo stated

"this fucking hurts" in reference to her handcuffs. ECF No. 52-5 ("Matosleo Video"), 10:16:08.

In response, Lieutenant Matosleo directed Officer Kopec to check the tightness of the handcuffs by seeing if he could fit his "whole" finger in them. *Id.* at 10:16:16. Officer Kopec then did so, stating to Olmo that his finger "was in it right now." *Id.* at 10:16:17-18. Shortly thereafter, Olmo told Officer Kopec that he was "putting pressure on the handcuffs" and asked him to "hold [her] by [her] upper arm" instead. Lam Video 10:16:44-50. Officer Kopec stated that he would do so if she stopped trying to remove her hands from behind her back; moments later, he shifted his grip to her arms and then placed her in the patrol vehicle. *Id.* at 10:16:50-57. A few minutes later, the Officers and Olmo arrived at the 24th Precinct, *id.* at 10:21:50, where she was charged with resisting arrest, obstructing governmental administration in the second degree, and disorderly conduct, *see* Defs.' SOMF ¶ 26.

Shortly after arriving at the Precinct, Olmo indicated that she did "not need medical attention." Lam Video 10:24:07. At some point, however, she was examined by an EMT because she reported feeling "light headed"; the EMT reported that Olmo's vital signs were stable and noted that she had no visible injuries. Defs.' SOMF ¶¶ 27-28. Sitting in a holding cell later, Olmo spoke on speaker phone to her "constitutional counselor" and complained that her wrists were swollen. Holding Cell Video 12:42:00; Pl.'s SOMF ¶ 53.[3] The "constitutional counselor" asked Officer Lam whether he was refusing to provide medical care to Olmo, to which Officer Lam responded that "EMS" had examined her and decided no medical care was necessary. *Id.* at 12:42:25-30. Olmo acknowledges that Officer Lam "eventually" brought her "one ice pack" for her wrists. Pl.'s SOMF ¶ 50; *see* Pl.'s Suppl. SOMF ¶ 13.

Olmo claims that she "endured physical discomfort in her bilateral wrists for several weeks after the arrest," Pl.'s Suppl. SOMF ¶ 20, and that the pain in her wrists made it "difficult

---

[3]    "Holding Cell Video" refers to a video that Olmo filed with the Court.

. . . to sleep if any pressure was applied for several days after the arrest," Pl.'s SOMF ¶ 86.  In addition, she alleges that "she was diagnosed with PTSD from the arrest . . . which continues to adversely impact her life."  Pl.'s Suppl. SOMF ¶ 20; *see also* Pl.'s Mem. 9 (alleging that Olmo "continues to suffer emotional distress triggered by law enforcement encounters.").

### LEGAL STANDARDS

Summary judgment is appropriate when the record demonstrates that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of informing the Court of the basis for its motion and identifying those portions of pleadings, depositions, answers to interrogatories, and admissions on file that demonstrate the absence of a genuine dispute regarding any material fact.  *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must view all evidence in the light most favorable to the non-moving party, *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

When a summary judgment motion is brought against a *pro se* litigant, as here, the Court must afford the non-movant with "special solicitude" in the construction of pleadings and motions and in the enforcement of procedural rules.  *See Tracy v. Freshwater*, 623 F.3d 90, 100-04 (2d. Cir. 2010) ("[I]n light of the particular difficulties presented by a motion for summary judgment . . . a district court errs by failing to advise a *pro se* litigant of the nature of such a

motion and the consequences of failing to respond to it properly.").  That special solicitude is not unlimited, however, and it does not "relieve [a] plaintiff of [her] duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted).  Specifically, to defeat a motion of summary judgment, a *pro se* plaintiff must still "come forward with evidence demonstrating that there is a genuine dispute regarding material fact." *Bennett v. Bailey*, No. 07-CV-7002 (PKC), 2010 WL 1459192, at *3 (S.D.N.Y. Apr. 9, 2010) (citation omitted).

## DISCUSSION

Liberally construed, Olmo's Amended Complaint brings three federal claims pursuant to Section 1983: that Defendants stopped and seized her car in violation of the Fourth Amendment, that Defendants falsely arrested her without probable cause, and that Defendants used excessive force.  *See* ECF No. 3 ("FAC"), ¶¶ 13-15, 18, 19.[4]  She also brings claims under New York law. *See* FAC ¶ 17.  Defendants move for summary judgment on all claims.  The Court will address the claims under federal law first.

---

[4]     In her memorandum of law opposing Defendants' motion for summary judgment, Olmo makes a passing reference to malicious prosecution.  *See* Pl.'s Mem. 1.  But her Amended Complaint does not include any such claim, so the Court does not consider it.  *See, e.g., Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 775 n.4 (S.D.N.Y. 2006) ("The complaint makes no mention of [this] claim[] and plaintiff[] cannot amend [her] complaint through a legal memorandum." (citation omitted)).  In her Amended Complaint, Olmo does cite various provisions from the federal criminal code — namely, "Deprivation of Rights Under Color of Law," 18 U.S.C. § 242; Kidnapping, 18 U.S.C. § 1201; Treason, 18 U.S.C. § 2381; and "Extortion by officers or employees of the United States," 18 U.S.C. § 872.  *See* FAC 6-12.  But private citizens "cannot prosecute . . . criminal action[s] in federal court." *Uppal v. Bank of Am.*, No. 18-CV-3085 (CM), 2018 WL 10323032, at *2 (S.D.N.Y. Oct. 4, 2018) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution . . . of another.")).

**A.  The Car Stop Claim**

The Court begins with Olmo's claim that the vehicle checkpoint and resulting seizure of her car violated the Fourth Amendment's prohibition on "unreasonable searches and seizures." Vehicle "checkpoint stops are 'seizures' within the meaning of the Fourth Amendment," *United States v. Martinez-Fuerte*, 428 U.S. 543, 556 (1976); *accord Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 450 (1990), and a seizure is usually "unreasonable in the absence of individualized suspicion of wrongdoing," *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (citing *Chander v. Miller*, 520 U.S. 305, 308 (1997)).  That said, "a warrantless, suspicionless search [or seizure] may be justified 'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'"  *United States v. Amerson*, 483 F.3d 73, 80 (2d Cir. 2007) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)).  Applying this "special needs" doctrine, the Supreme Court and Second Circuit have held that vehicle checkpoints can be permissible intrusions under the Fourth Amendment, so long as the checkpoint's "primary purpose" is *not* a "general interest in crime control." *Edmond*, 531 U.S. at 38-40; *see, e.g.*, *Illinois v. Lidster*, 540 U.S. 419, 427-28 (2004); *Sitz*, 496 U.S. at 455; *Martinez-Fuerte*, 428 U.S. at 566; *Maxwell v. City of New York*, 102 F.3d 664, 667 (2d Cir. 1996).

Most relevant here, courts have held that fixed vehicle checkpoints that are designed to promote roadway safety and follow a neutral, pre-established plan are generally permissible under the "special needs" doctrine.  *See, e.g.*, *Martinez Fuerte*, 428 U.S. at 557-58; *United States v. Bernacet*, 724 F.3d 269, 273-74 (2d Cir. 2013); *United States v. Santiago*, 950 F. Supp. 590, 595 (S.D.N.Y. 1996).  Specifically, law enforcement may develop "methods for spot checks" of driver's licenses and automobile registrations "that do not involve the unconstrained exercise of

7

discretion." *Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (holding that roving stops of automobiles absent individualized suspicion of wrongdoing were unconstitutional). For instance, stopping "all oncoming traffic at roadblock-type stops" to verify driver's licenses and vehicle registrations is permissible under the Fourth Amendment. *Id.*; *accord Bernacet*, 724 F.3d at 273-74 (holding that a fixed traffic safety checkpoint, in which police officers ran driver's licenses through a law enforcement database, was constitutional). So too are "other not purely random stops (such as every 10th car to pass a given point) that equate with, but are less intrusive than, a 100% roadblock stop." *Prouse*, 440 U.S. at 664 (Blackmun, J., concurring); *see Edmond*, 531 U.S. at 47 ("[O]ur holding today does nothing to alter the constitutional status . . . of the type of traffic checkpoint that we suggested would be lawful in *Prouse*." (citation omitted)).

Applying these standards here, the Court concludes that Olmo's Fourth Amendment claim based on the stop and seizure of her car fails as a matter of law. The vehicle checkpoint was fixed and, pursuant to a neutral, pre-established plan that constrained discretion, Defendants stopped every third vehicle that passed "to verify driver licenses, registration, and vehicle safety." Defs.' SOMF, ¶¶ 1-5; *see also* Lam Video 10:11:52 (Officer Kopec telling Olmo that "we just have to see your driver's license and registration, and you will be on your way"). Indeed, the vehicle checkpoint at issue here is akin to the one in *Bernacet*, which the Second Circuit approved because the "government's interest in conducting a fixed checkpoint to monitor traffic safety . . . outweighs drivers' privacy interests." 724 F.3d at 273-74. Olmo argues that "saying a checkpoint is for public safety is not enough." Pl.'s Mem. 2. But there is no evidence in the record to suggest that the "primary purpose" of the checkpoint was not vehicle safety — or, more to the point, that it *was* a "general interest in crime control." *Edmond*, 531 U.S. at 40; *see also, e.g.*, *Wagner v. Sprague*, 489 F. App'x 500, 501 (2d Cir. 2012) (summary order)

8

("[T]he mere fact that crime control is *one* purpose — but not the *primary* purpose — of a program of searches does not bar the application of the special needs doctrine." (citations omitted)).  Accordingly, Defendants' motion for summary judgment must be and is granted with respect to Olmo's claim that the stop and seizure of her car violated the Fourth Amendment.

## B.  The False Arrest Claim

The Court next turns to Olmo's false arrest claim.  To state a Section 1983 false arrest claim, a plaintiff must allege "that (1) the defendant intended to confine [her], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (per curiam) (internal quotation marks omitted); *see also Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("A § 1983 claim for false arrest . . . is substantially the same as a claim for false arrest under New York law.").  Thus, a plaintiff may not bring a false arrest claim if there was probable cause to arrest her for an offense.  *See, e.g.*, *Betts v. Shearman*, 751 F.3d 78, 81 (2d Cir. 2014).  Probable cause to arrest exists if an arresting officer has actual "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852.  A court must consider the "totality of the circumstances" in evaluating whether the "facts available to the officer at the time of arrest" meet that threshold.  *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (internal quotation marks omitted).  Significantly, it is enough to defeat a claim that probable cause existed for *some* offense; that is, it is irrelevant "whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the

time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (Sotomayor, J.); *accord Figueroa v. Mazza*, 825 F.3d 89, 99-100 (2d Cir. 2016).

Notably, however, Defendants may be entitled to summary judgment on Olmo's false arrest claim even in the absence of actual probable cause. That is because a law enforcement officer is entitled to qualified immunity if only "arguable probable cause" existed — that is, if "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law." *Cerrone v. Brown*, 246 F.3d 194, 202-03 (2d Cir. 2001) (internal quotation marks omitted); *see Kass v. City of New York*, 864 F.3d 200, 205-07 (2d Cir. 2017) (holding that the defendant officers were entitled to qualified immunity because there was arguable probable cause, without reaching the question of whether there was actual probable cause). Specifically, the doctrine of qualified immunity provides a complete defense where "either (a) it was objectively reasonable for the officer to believe that probable cause existed, *or* (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (emphasis added); *accord Kass*, 864 F.3d at 206 ("The qualified immunity defense . . . is a broad shield that protects 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013))). A defendant is entitled to summary judgment on the basis of qualified immunity if he or she demonstrates "that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Coollick v. Hughes*, 699 F.3d 211, 219 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

Applying the foregoing principles here, the Court concludes that Olmo's federal false arrest claim fails because, at a minimum, Defendants had arguable probable cause to arrest her for obstructing governmental administration.  Under New York law, "[a] person is guilty of obstructing governmental administration when [s]he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act." *Kass*, 864 F.3d at 206-07 (quoting N.Y. Penal Law § 195.05); *see also Antic v. City of New York*, 740 F. App'x 203, 206 (2d Cir. 2018) (summary order).  "An individual, therefore, may be convicted under this statute when (1) a public servant is performing an official function; (2) the individual prevents or attempts to prevent the performance of that function by interfering with it; and (3) the individual does so intentionally." *Kass*, 864 F.3d at 207 (citation omitted).  With respect to the second element, "the interference must at least in part be 'physical' and cannot consist solely of verbal statements," but "an officer may consider both words and deeds in determining whether the individual's conduct is sufficiently obstructive to justify an arrest." *Id.* at 209-10 (citations omitted) (finding that the second element was satisfied where the plaintiff had "pulled away" from a police officer attempting to get him to "move along" from police barricades on a sidewalk at a protest).  With respect to the third element, "an individual who interferes with an official function must intend to prevent the officers from performing that function." *Id.* at 210. Significantly, however, "the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be . . . great." *Id.* (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 393 (2013) (citation omitted)).

11

Here, there is no question that "a reasonable police officer in the same circumstances and possessing the same knowledge as" Defendants "could have reasonably believed that probable cause existed" to arrest Olmo for obstructing governmental administration. *Cerrone*, 246 F.3d at 202-03. First, Defendants were indisputably performing an official function in operating the vehicle checkpoint to verify driver's licenses and vehicle registrations as well as monitor vehicle safety. Second, Olmo prevented Defendants from performing that function by interfering with it in various respects: She failed to pull her vehicle forward despite repeated orders from Officers Lam and Kopec, *see* Lam Video 10:11:35-46; refused to give Defendants her driver's license and vehicle registration despite repeated requests; failed to turn off her vehicle when Defendants directed her to do so, instead stating, "I am not following orders; I don't consent," *id.* at 10:13:40-46; refused to step out of her vehicle when ordered to do so, *id.* at 10:13:52; and physically resisted when Officers Lam and Kopec attempted to remove her from her vehicle, *id.* at 10:14:03-40. These forms of interference were "at least in part . . . 'physical'" and did not "consist solely of verbal statements." *Kass*, 864 F.3d at 209-10. Indeed, they resemble the forms of interference that the Second Circuit found adequate to support probable cause in *Kass*. Finally, it is undisputed that Olmo "intend[ed] to prevent the officers" from performing their official function. *Id.* at 210 (quoting *Zalaski*, 723 F.3d at 393); *see, e.g.*, Lam Body Cam 10:12:02. That she believed herself to be legally justified in doing so is of no moment, especially given the great latitude that the Court must afford Defendants in "considering the probable cause issue in the context of mens rea crimes." *Kass*, 864 F.3d at 210.

In short, Defendants had at least arguable probable cause to arrest Olmo for obstructing governmental administration in the second degree. It follows that Defendants are entitled to qualified immunity — and thus summary judgment — with respect to her false arrest claim.

## C. The Excessive Force Claim

Olmo's final federal claim is for excessive force based on her handcuffing during the September 6, 2023 arrest.  "The question" in assessing whether a police officer has used excessive force in handcuffing a plaintiff is "whether an officer reasonably should have known during handcuffing that his use of force was excessive."  *Cugini v. City of New York*, 941 F.3d 604, 613 (2d Cir. 2019).  "A plaintiff satisfies this requirement if either the unreasonableness of the force used was apparent under the circumstances, or the plaintiff signaled her distress, verbally or otherwise, such that a reasonable officer would have been aware of her pain, or both."  *Id.*  "The proper application of the reasonableness standard . . . 'requires careful attention to the facts and circumstances of each particular case, including' (1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade by flight.'"  *Id.* at 612 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

"In analyzing excessive force claims arising out of the use of handcuffs, courts in this circuit frequently consider (1) whether the handcuffs were unreasonably tight; (2) whether the defendants ignored the plaintiff's pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists."  *Gonzalez v. Hirschman*, No. 15-CV-810 (GHW), 2016 WL 354913, at *4 (S.D.N.Y. Jan. 28, 2016) (internal quotation marks omitted).  "It is well established in this Circuit that claims of excessive force are not established by allegations that overly tight handcuffs caused minor, temporary injuries."  *Sullivan v. City of New York*, No. 17-CV-3779 (KPF), 2018 WL 3368706, at *10 (S.D.N.Y. July 10, 2018) (internal quotation marks and alterations omitted) (collecting cases).  At the same time, "[a] court's reasonableness analysis is not limited to a factual checklist; it must be guided by a 'careful balanc[e]' between the 'nature

and quality of the intrusion' and the 'countervailing government[al] interests at stake' under the circumstances." *Cugini*, 941 F.3d at 613 (quoting *Graham*, 490 U.S. at 396).  And "[w]hether the defendants violated plaintiff's constitutional right to be free from excessive force relies on a determination that the officers acted reasonably." *Muhammad v. City of New York*, No. 17-CV-5166 (LAK), 2019 WL 6647911, at *2 n.9 (S.D.N.Y. Nov. 18, 2019).

Measured against these standards, Olmo's excessive force claim does not survive Defendants' motion for summary judgment.  Although obstructing governmental administration is a relatively minor crime, and Olmo did not attempt to flee, she did ignore Defendants repeated orders and actively resisted her arrest.  For example, Olmo refused to exit her car when ordered to do so, *see* Lam Video 10:13:52; attempted to roll up her window even as Officer Kopec had his hand inside the car trying to open the door, *see id.* at 10:13:58; held on to her seatbelt as Officer Lam tried to undue it, *see id.* at 10:14:03; attempted to prevent Defendants from placing her hands behind her back in handcuffs, *see id.* at 10:14:14-40; and, after Defendants placed her in handcuffs, continued to try and bring her hands from behind her back, *see, e.g.*, *id.* at 10:16:50-57.  Meanwhile, Defendants did not ignore any pleas that the handcuffs were too tight. To the contrary: When Olmo declared that "this fucking hurts" in reference to her handcuffs, *see* Matosleo Video 10:16:08, Lieutenant Matosleo instructed Officer Kopec to check how tight the handcuffs were, and Officer Kopec promptly did so by placing one of his fingers inside them. *See id.* at 10:16:16-18.  Shortly thereafter, Olmo complained that Officer Kopec was "putting pressure on the handcuffs" and asked him to "hold [her] by [her] upper arm" instead.  *See* Lam Video 10:16:44-50.  Officer Kopec promptly shifted his grip to her forearms.  *Id.*

Finally, the injuries that Olmo alleges she sustained as a result of the handcuffing are not sufficient to support a claim for excessive force.  For starters, Olmo's "claim of 'mental anguish'

14

and 'heightened anxiety' is insufficient because emotional pain and suffering cannot form the basis of an excessive force claim." *D'Attore v. City of New York*, No. 10-CV-6646 (WHP), 2013 WL 1180395, at *5 (S.D.N.Y. Mar. 15, 2013) (quoting *Davis v. United States*, No. 03-CV-1800 (NRB), 2004 WL 324880, at *10 n.6 (S.D.N.Y. Fed. 18, 2004)); *see also Vasquez v. Cnty. Of Rockland*, 13-CV-5632 (SLC), 2020 WL 883514, at *15 n.13 (Feb. 24, 2020) ("To the extent [Plaintiff] asserts that his difficulty sleeping, stress, and sexual dysfunction were caused by the incident . . . such emotional injuries cannot form the basis of an excessive force claim." (internal quotation marks omitted)).  And while she alleges "physical discomfort in her . . . wrists for several weeks," Pl.'s Suppl. SOMF ¶ 20, and "swelling and pain . . . for several days after the arrest, *id.* ¶ 86, these are the types of "minor, temporary injuries" that cannot sustain a claim for excessive force. *See, e.g.*, *Sullivan*, 2018 WL 3368706, at *10 (collecting cases).

In sum, a reasonable police officer in Defendants' positions would not have known that the use of force was excessive during Olmo's arrest.  Accordingly, Defendants' motion for summary judgment with respect to Olmo's excessive force claim must be and is also granted.

## D.  State-Law Claims

That leaves only Olmo's state-law claims.  Under 28 U.S.C. § 1367, a district court "may decline to exercise supplemental jurisdiction over [a pendent state law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction."  The statute does not create "a mandatory rule to be applied inflexibly in all cases." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  Nevertheless, "in the usual case in which all federal-law claims are eliminated before trial," as here, "the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.*; *see, e.g.*, *Marcus v.*

*AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 147 (E.D.N.Y. 2015) ("In the interest of comity, the Second Circuit instructs that absent exceptional circumstances, where federal claims can be disposed of . . . [on] summary judgment grounds, courts should abstain from exercising pendent jurisdiction." (internal quotation marks omitted)).  Here, there is no basis to depart from that general rule.  Accordingly, Olmo's state-law claims are dismissed without prejudice to refiling those claims in state court. *See, e.g.*, *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, No. 20-CV-5428 (JMF), 2024 WL 641263, at *7 (S.D.N.Y. Feb. 15, 2024).

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED and Olmo's claims are dismissed, albeit without prejudice to refiling the state-law claims in state court.  The Clerk of Court is directed to terminate ECF No. 51, to enter judgment in favor of Defendants consistent with this Opinion and Order, and to close the case.

SO ORDERED.

Dated: February 12, 2026
      New York, New York

_____
JESSE M. FURMAN
United States District Judge

16